[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Shea Cook, P.C., has brought this action for money damages, interest and attorney's fees on a certain promissory note dated May 6, 1998 (the second note). The maker of the second note, in the amount of $6,000, was John Eoanou. In addition to this action on the $6,000 second note, William T. Shea, Trustee, and Howard Falk, Trustee, (the Trustees) have brought another action — Docket Number CV99-0270255 — against the same defendant on a $125,000 note (the note) of the same date. By way of special defenses, the defendant has asserted that there was no consideration for the note and that the note was usurious.
The court heard testimony on October 17, and October 19, 2001. In CT Page 1204 addition, the court had the benefit of the parties' post-trial memoranda of law. Unfortunately, the plaintiff recited no legal authority in its post-trial memorandum.
 I. FACTS
The more credible evidence leads to the following factual findings. In 1996, LBS Bank (the Bank) owned certain real property in Groton, Connecticut consisting of approximately nineteen acres (the real property). Title to the real property was technically in the name of Groton Property, Inc., a wholly-owned subsidiary of the Bank. William T. Shea was a practicing attorney, who had handled transactions with and for the Bank prior to 1996. Shea was the law partner of Kerry A. Cook, the attorney for the plaintiffs in this case. The law firm is Shea Cook, P.C.; Shea is the president of Shea Cook, P.C.
John Eoanou of Easton, Connecticut was a developer of residential properties. In 1996, he was desirous of purchasing the real property. The real property was listed for sale by Helen Falk, as the real estate agent for the Bank. By agreement between Helen Falk and the Bank, the agent's commission was 7.5 percent.
In 1996, Eoanou owed $100,000 to a group of investors known as Apple Financial Group, Inc. (Apple). Apple and Eoanou conceived the idea that Eoanou could purchase the real property so that Eoanou could use the real property as collateral to leverage a high mortgage and thereby pay off the unrelated $100,000 debt owed to Apple. In the alternative, Apple could at least place a second mortgage on the real property to secure its claim against Eoanou. One of the Apple investors brought Eoanou to Shea with the expectation that Shea could introduce Eoanou as a prospective purchaser. Shea would make the connection between the Bank, as seller of the real property, and Eoanou, as buyer of the real property. Shea fulfilled the requested role.
Shea prepared an option agreement and later a contract of sale to be executed by Groton Property, Inc. and Eoanou. The contract was signed on January 28, 1997. The purchase price was $1,000,000. Although Shea acted as go-between to arrange the sale/purchase transaction, he did not represent Eoanou nor perform any legal work for Eoanou at this stage of the proceedings. There was no retainer agreement for legal services.
Upon the successful completion of the sale, the Bank would pay Helen Falk $75,000 for her services as the real estate agent. On January 17, 1997, Helen Falk executed a "Commission Agreement" whereby she assigned "one-third of any commission paid as a result of the real estate transaction between Groton Properties, Inc. [sic] and John Eoanou" to CT Page 1205 Apple and one-third of the commission to the law firm of Shea Cook, P.C. The Commission Agreement was executed by Helen Falk for herself, by Marc Nathan on behalf of Apple, and by William T. Shea on behalf of Shea Cook, P.C. By the terms of the Commission Agreement, Helen Falk's assignment of two-thirds of her commission was because the real property was brought to Eoanou's attention by the joint efforts of Helen Falk, Apple and Shea Cook, P.C. Helen Falk's intention was to share part of her commission as a real estate agent with Apple and part with Shea 
Cook, P.C. Neither Shea nor Apple holds a real estate broker or salesperson license in Connecticut. The commission sharing was in recognition of Shea's assistance to Helen Falk in negotiating the sale of the real property. Whether it was termed a finder's fee, a referral fee, or a facilitator's fee, Shea Cook, P.C. was to receive $25,000 of Helen Falk's $75,000 real estate agent's fee.
The closing was May 6, 1998, at the law office of Shea Cook, P.C. Although Shea Cook, P.C., as a law office, represented none of the parties to the transaction, Shea provided the office space for the closing. Eoanou and White signed documents on May 6, 1998, to form Boulder Run with the two of them as principals and co-equal partners in the corporation.
Shea asserted at the closing that a $50,000 contingency fee for arranging the mortgage must be paid to him. Eoanou claimed to know nothing of the $50,000 fee, but White acknowledged the debt on behalf of the partnership. In addition, Shea presented a bill in the amount of $15,000 to Eoanou individually for legal services rendered in the drawing of the original option and the contract of sale. Eoanou protested that he never retained Shea to represent him individually or otherwise and that Shea rendered no legal services to him.
At this point in the closing, Shea and Howard Falk, husband of the real estate agent Helen Falk, escorted Eoanou to a separate room at Shea 
Cook, P.C. Eoanou's own attorney was not in the three-person meeting that ensued. Shea and Howard Falk put it to Eoanou that the closing would not go through without the signing of additional notes on Shea's claims. Eoanou's deposit of $68,000 would be sacrificed if the closing did not take place. Shea reduced the $15,000 bill for legal services to $12,000. Eoanou capitulated. He agreed on behalf of Boulder Run to sign a $50,000 note to Shea and he agreed to give a personal guarantee. Eoanou also agreed to a second note for one-half ($6,000) of the $12,000 legal fee. Shea and Howard Falk determined that a $75,000 Boulder Run debt to Helen Falk and the $50,000 debt to Shea should be combined in one note and would be the second mortgage on the real property. The $6,000 debt was to be separate. It was the fourth mortgage against the real property after a mortgage to Apple in the amount of $100,000 as the third mortgage. The CT Page 1206 closing proceeded on May 6, 1998, with the understanding that Shea would hold the deed to the real property to prevent its recording until all the necessary paperwork on the new notes and mortgage deeds was also available to be recorded.
Later in May, 1998, Eoanou signed the $125,000 note and mortgage deed on behalf of Boulder Run to the benefit of the Trustees as holder. Although the documents were dated May 6, 1998, they were actually signed on a later date. Eoanou also signed a personal guarantee on the note. Eoanou also personally executed the $6,000 second note and deed for the benefit of Shea Cook, P.C.
Shea did not cause the deed to be recorded until the notes, mortgage deeds and trust document were executed by all the participants. Shortly after the closing, Eoanou or White paid $5,000 on the $125,000 note; no additional payment was made. Shortly after the closing, Eoanou paid $1,500 to Shea on the $6,000 second note; no further payments have been made. Eoanou made one monthly mortgage payment to the Bank and no payments thereafter. The Bank foreclosed. No proceeds were available to any subsequent mortgagees after the Bank's first mortgage.
 II. DISCUSSION
Shea Cook, P.C. owns the $6,000 second note; Eoanou signed the second note; and the note is in default after an initial payment of $1,500. The legal issues in dispute in this case arise solely from the special defenses. "The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." Grant v.Bassman, 221 Conn. 465, 472-73, 604 A.2d 814 (1992).
Under a simple contract theory of a note, lack of consideration can be raised as a valid defense. See Appliances, Inc. v. Yost, 186 Conn. 673,679, 443 A.2d 486 (1982). Because lack of consideration is a defense under a simple contract, such a defense is also available under the Uniform Commercial Code. General Statutes § 42a-3-305 (a)(2).[1]
The burden of proof to show lack of consideration is upon Eoanou. Kesslerv. Valerio, 102 Conn. 620, 623, 129 A. 788 (1925).
Shea's assertion is that he rendered legal services for which Eoanou must pay. Shea introduced Eoanou to the Bank and prepared the option and sales contracts. Shea claims that his fee, which was at an hourly rate, was an attorney's fee. Eoanou says that if Shea was rendering legal services to anyone, it was the Bank that received the services. Shea acknowledges that he never presented a bill to Eoanou prior to the closing. Shea is unable to itemize his time to justify the amount of the CT Page 1207 bill. In addition, he acknowledges a lack of a retainer agreement for legal services, as required by rule 1.5 of the Rules of Professional Conduct.[2] Shea himself testified that he never represented Eoanou between 1996, and 1998. Shea's claim seems to be that somebody needs to recompense him for the drafting of the option and sales contracts, and Eoanou was the most likely candidate at the closing to be coerced into signing a note.
Shea was not acting as an attorney for Eoanou when he introduced Eoanou to the Bank. He was not representing Eoanou when he prepared the option and sales contracts. The $6,000 second note fails for lack of consideration.
 III. CONCLUSION
Consideration is lacking for the second note. Judgment shall enter in favor of the defendant.
____________________ Winslow, J.